IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

LAWANDA REEDS,            )
                         )
          Plaintiff,      )
                         )
     v.                   )      Case No. 04-0965-REL-SSA
                         )
JO ANNE BARNHART, Commissioner )
of Social Security,       )
                         )
          Defendant.      )

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Lawanda Reeds seeks review of the final decision of the

Commissioner of Social Security denying plaintiff's application for a period of

disability and disability insurance benefits under Title II of the Social Security Act

("the Act").  Plaintiff argues that (1) the ALJ improperly assessed plaintiff's

credibility, (2) the ALJ improperly discounted the opinions of plaintiff's treating

physicians, Drs. Daaleman and Milligan, (3) the ALJ's residual functional capacity

assessment was not supported by substantial evidence, and (4) the ALJ erred in

relying on the testimony of the vocational expert.  I find that the ALJ erred in

finding plaintiff not credible, the ALJ's residual functional capacity assessment is

not supported by substantial evidence, the ALJ erred in finding that plaintiff could

return to her past relevant work, and the ALJ erred in finding plaintiff not

disabled.  Therefore, plaintiff's motion for summary judgment will be granted and

the decision of the Commissioner will be reversed.

## I.    BACKGROUND

On January 23, 2002, plaintiff applied for disability insurance benefits alleging that she had been disabled since November 27, 2001.  Plaintiff's disability stems from carpal tunnel syndrome in both wrists, osteoarthritis in both feet, and back problems.  Plaintiff's application was denied.  The denial was a "durational denial", meaning that although plaintiff appeared to be disabled, the Social Security Administration believed that she would improve and would be able to return to work before November 27, 2002 (i.e., her disability was not expected to last 12 months).  On April 8, 2004, a hearing was held before an Administrative Law Judge.  On April 20, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On August 18, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's

2

decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a

continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If

the plaintiff establishes that she is unable to return to past relevant work because

of the disability, the burden of persuasion shifts to the Commissioner to establish

that there is some other type of substantial gainful activity in the national

economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th

Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations

setting out a sequential evaluation process to determine whether a claimant is

disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The

five-step sequential evaluation process used by the Commissioner is outlined in

20 C.F.R. § 404.1520 and is summarized as follows:

    1.    Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

    2.    Does the claimant have a severe impairment or a combination of
impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

    3.    Does the impairment meet or equal a listed impairment in Appendix
1?

        Yes = disabled.
        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, medical expert Selbert Chernoff, M.D., and vocational expert Amy Salva, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following income from 1974 through 2002:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1974 | $   292.74 | 1989 | $    517.43 |
| 1975 | 0.00 | 1990 | 1,540.55 |
| 1976 | 0.00 | 1991 | 8,645.82 |
| 1977 | 0.00 | 1992 | 6,998.26 |
| 1978 | 0.00 | 1993 | 2,359.20 |
| 1979 | 0.00 | 1994 | 4,432.88 |

5

| 1980 | 2,578.55 | 1995 | 10,341.25 |
|------|----------|------|-----------|
| 1981 | 2,823.75 | 1996 | 8,828.84 |
| 1982 | 2,126.61 | 1997 | 7,182.22 |
| 1983 | 6,714.09 | 1998 | 14,359.95 |
| 1984 | 404.00 | 1999 | 15,083.75 |
| 1985 | 0.00 | 2000 | 21,264.37 |
| 1986 | 2,562.05 | 2001 | 21,085.70 |
| 1987 | 2,286.00 | 2002 | 5,379.87 |
| 1988 | 3,237.50 | | |

(Tr. at 67-72).

**B.    SUMMARY OF MEDICAL RECORDS**

On April 7, 2000, plaintiff saw Bruce Toby, M.D., an orthopedic surgeon at the University of Kansas Medical Center ("KU")  (Tr. at 171).  "The patient complained of approximately a 5 month history of episodic numbness and tingling in her right hand worsening at night. . . .  The patient also states that she did have a history of a pinched nerve in her neck in the past but it has not been giving her any trouble currently.  The patient now also complains of a 1 week history of pain in her left posterior forearm, especially with wrist and finger extension.  The pain extends from above the elbow along the posterolateral aspect of the arm. The patient went to the emergency room 3 days prior to the clinic appointment and was started on Vioxx and was given Tylenol #3 for pain

6

and given an arm sling. She has had little improvement of symptoms since the emergency room visit.

"On exam her right upper extremity reveals positive Tinel's[1] and Phalen's[2] signs at the wrist. . . . Exam of the left upper extremity revealed significant palpable tenderness on the lateral condyle extending to the extensor servers of the forearm and worsening with wrist extension and finger extension."

Diagnosis: Possible carpal tunnel syndrome of right and left upper extremity. Tennis elbow of the left upper extremity.

Plan: "The patient is to continue on Vioxx and was given a forearm tennis elbow strap for the left arm. She was given two splints for both wrists. She is to wear left wrist splint continuously and is to wear the right wrist splint at night. We also arranged for nerve conduction and electrical studies of the nerve function in bilateral upper extremities at this time."

On May 1, 2000, plaintiff returned to see Dr. Toby (Tr. at 170). Plaintiff returned after having electrodiagnostic studies revealing bilateral carpal tunnel syndrome. "The numbers would indicate that it is worse on the right than left. . . .

_____

[1]Tinel's sign is a way to detect irritated nerves. It is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or "pins and needles" in the distribution of the nerve.

[2]Phalen's maneuver is a test for carpal tunnel syndrome. The patient is asked to keep his or her wrist at the extremity of flexion for 30 seconds. The aim is to compress the carpal tunnel and thus elicit the characteristic symptoms of the carpal tunnel syndrome. If the patient experiences a burning, tingling or numb sensation over the thumb, index, middle and ring fingers, then the test is positive.

Case 4:04-cv-00965-REL   Document 14   Filed 09/30/05   Page 7 of 37

Her motor latency on the right side was 5.8. The motor latency on the left was 3.9.  The sensory latency was 5.6 on the right with a sensory latency of 3.8 on the left. . . .  I have talked to them at length, including her husband who had a lot of questions, about carpal tunnel releases.  I told him that they should probably see Dr. Horton for her foot deformities. With respect to a carpal tunnel release, although a successful operation would decrease her numbness and tingling, it is not a panacea for all problems.  I told them that they should think about it."

On July 31, 2000, plaintiff saw Greg Horton, M.D., an orthopedic surgeon at KU, after having been referred by Dr. Toby for bilateral foot pain  (Tr. at 168-169).  "This has been long-standing since the early '70s, progressively worsening since this time.  She is only able to be on her feet 5-10 minutes before she has to sit down secondary to pain. . . .  She's tried anti-inflammatories, inserts and elevated shoes without any improvement."

Exam:  "She has pain over her subtalar joint [just below the ankle], also over plantar fascia[3] that is worsened with dorsiflexion [upward movement] of her toes.  All these findings are bilateral. Range of motion is slightly decreased in her subtalar joint. . . .  X-rays of bilateral feet today show mild arthrosis of her subtalar and TMT joints [between the sole and instep of the foot].  She also has some hallux rigidus bilaterally."

_____

[3]The plantar fascia is the thick connective tissue which supports the arch of the foot.

Dr. Horton assessed diffuse foot pain, bilateral plantar fasciitis[4]. "I think she does have some plantar fasciitis contributing to her symptomatology although given the diffuse nature this doesn't seem to be the only thing going on. . . . I'll have her start on some physical therapy for her plantar fasciitis. I'd also like to obtain a bone scan to see if I can better localize any sources of pain in her feet."

On August 17, 2000, plaintiff returned to see Dr. Horton for a follow up on her feet (Tr. at 167). "She's recently had a bone scan, which is interesting in that she has multiple areas of uptake[5], particularly in the hindfoot region. She has uptake in both subtalar joints. I carefully examined these areas. Her subtalar joints do indeed cause her discomfort. However, she has so many other areas of discomfort that it is pretty hard to blame it all on the subtalar joint alone. Stated another way, I don't think any surgical intervention aimed at her subtalar joint would provide her with substantial enough relief to warrant this at this time. . . ." Dr. Horton recommend some anti-inflammatories and stretching "which I think will help her plantar fasciitis component of this."

On March 22, 2001, plaintiff saw Dewey Ziegler, M.D., in the Headache Clinic of the Department of Neurology at KU (Tr. at 157-158). "She has an almost daily headache which she awakens with in the morning. She customarily

[4]Inflammation of the plantar fascia causing foot or heel pain.

[5]The absorption of a tissue of some substance and its permanent or temporary retention.

takes two Excedrin tablets which almost invariably stops the headache. Approximately once and occasionally twice a week she will need a second dose of two Excedrin tablets. This again will usually stop the headaches but half of the time the headaches will persist, become extremely severe, develop into a headache associated with nausea, vomiting, severe photophobia and phonophobia and pulsating in nature. This requires visits to the hospital and she states that when she is given narcotics in the hospital it only makes the headaches worse. . . . She works as a telephone operator in the hospital and has been able to carry on with her job except for the days when the extreme headaches supervene."

Past Medical History: "She has been diagnosed as having had hepatitis C which was found by a blood test when she went to donate plasma. She denies having symptoms from this although she says she has had some epigastric pain. She has also had a cyst of the chest of undetermined nature. She also has osteoarthritis for which she takes medicine on occasion."

A neurological examination was performed. "I think she very well might respond to triptans and I prescribed for the abortive treatment of migraine Maxalt 10 mgs to take if her second dose of migraine Excedrin does not work. For prophylaxis she is to try Inderal beginning with 40 mgs a day for ten days and then rising to 80 mgs. She was warned about possible side effects. Also for prophylaxis she was prescribed Amitriptyline 10 mgs at night and also to aid in

her sleeping which has been a problem. She was also given a prescription for 10 mgs of Reglan at the onset of the migraine to prevent nausea and vomiting."

On April 25, 2001, plaintiff was seen in the emergency room at KU for left side head pain for three days (Tr. at 153-154). Plaintiff said it hurt to comb her hair, she could not sleep on her left side, light bothered her eyes. The ER staff called a neurologist who treats migraines.

On June 21, 2001, plaintiff had a neurological examination at KU due to migraines (Tr. at 149-152). Most of the record is illegible.

On July 2, 2001, plaintiff had a hepatology evaluation at KU (Tr. at 148). She complained of chronic headaches and migraines, dizziness. Most of the record is illegible. The doctor diagnosed positive Hepatitis C antibodies, right upper quadrant pain, gastroesophageal reflux disease, and increased body mass index (plaintiff's weight was 230 pounds).

On July 19, 2001, plaintiff had another hepatology evaluation at KU due to worsening right upper quadrant pain (Tr. at 147). Most of the record is illegible.

On July 23, 2001, plaintiff had an upper endoscopy performed by Mojtaba S. Olyaee, M.D., at KU for evaluation of abdominal pain and chronic gastroesophageal reflux disease (Tr. at 145-146). Findings: "A small erosion was found in the lower esophagus. An ulcer was found in the antrum. . . . Multiple biopsies were taken from the ulcer. Multiple erosions were found at the

pylorus.  Gastric survielence[6] biopsies were obtained."  Recommendation:  await

biopsy results.

On July 30, 2001, plaintiff saw Reginald Dusing, M.D., at KU (Tr. at 142-

143).  The radiology report showed a "gallbladder ejection fraction of 15.3%.

Normal is greater than 50% with abnormal being less than 35%."

On August 23, 2001, plaintiff saw Daniel Murillo, M.D., a surgeon at KU

(Tr. at 134-136).  Dr. Murillo performed a laparoscopic cholecystectomy with

laparoscopic wedge liver biopsy.  Ivan Damjanov, M.D., prepared the pathology

report.  His diagnosis after microscopic examination was Steatosis [fatty

degeneration of the liver], Chronic cholecystitis [inflammation of the gallbladder].

On September 10, 2001, plaintiff returned to see Dr. Murillo (Tr. at 132).

She was "status post laparoscopic cholecystectomy and laparoscopic liver biopsy

for biliary dyskinesia and Hepatitis C on 8/23/01.  The patient presents to clinic

for routine post operative follow up and wound evaluation."   Dr. Murillo

recommended she return in one week.

Plaintiff again saw Dr. Murillo at September 17, 2001 (Tr. at 131).  "Ms.

Reeds presents to clinic today status post laparoscopic cholecystectomy. . . .  On

physical examination, the patient's weight is 222 lbs.  Her blood pressure is

126/84. . . .  In summary, the patient has a healing superficial wound infection at

_____

[6]I have been unable to find a definition for this word and suspect it is
mistyped.

the trocar site. She was advised to continue with her wound care and to return to clinic as needed."

On September 20, 2001, plaintiff had a neurological examination performed at KU by Dr. Ziegler (Tr. at 127-130). Plaintiff noted her headaches were "markedly less" with the use of an illegible drug. However, she complained of recurrent spells of feeling "as if she will fall unless she holds on. Denies vertigo. No spells with lying down. Feels as if about to lose consciousness." Several tests were performed. Assessment: "Migraines under good control with [illegible] spells to be investigated with consult to cardiology and EEG."

On October 2, 2001, plaintiff saw Thomas Rosamond, M.D., at Mid-America Cardiology (Tr. at 124-125). "53-year-old switchboard operator here at KUMC [KU Medical Center]. Over the past 2-3 years she has had increasingly frequent dizzy spells. She now has nearly 3-4 episodes weekly. They last approximately 5 minutes each. . . . [S]he is unable to maintain a steady balance when the episodes occur. . . . Cardiac risk factors: She is not a smoker. She denies diabetes mellitus or hypertension. She is being treated by Dr. Moriarty for hyperlipidemia and obesity and is on a low cholesterol/low fat diet. . . . She has a history of carpal tunnel syndrome and osteoarthritis of her feet. . . ."

Physical exam included carotid massage and 12-lead EKG. "In summary, this is a 53-year-old female with dizzy spells of an undetermined etiology. They really do not sound cardiac in nature but I think it would be helpful to obtain a 30-

13

day looping recorder to try and isolate an episode and rule out tachy-bradyarrhythmia.  I would also like to perform an exercise echocardiogram with Doppler to be sure there is no structural or functional heart disease that might be implicated in her symptoms.  If these studies are negative, then I do not feel that her symptoms are likely to be cardiac in origin.  We could also consider a tilt table test if other avenues of inquiry are not definitive."

On October 11, 2001, Gang Gary Lian, M.D., of KU performed an EEG due to history of migraine headaches, and plaintiff presented with episodes of dizzy spells associated with headaches (Tr. at 123).  Negative awake/sleep EEG.

On November 27, 2001, plaintiff went to the emergency room at KU complaining of lower back pain, new onset this morning (Tr. at 115).  The pain was aggravated by movement, relieved by remaining still.  The doctor diagnosed acute myofascial strain, lumbar.  Prescribed Motrin 800 mg., Flexeril, the remaining prescriptions are illegible.

Plaintiff attended physical therapy at KU on November 29, 2001; December 3, 2001; December 5, 2001; December 7, 2001; December 10, 2001; and December 14, 2001  (Tr. at 107, 108, 113, 115).  On December 3, 2001, plaintiff reported that, "Last Tuesday 11/26/01 couldn't get out of bed, severe pain central low back, son's wedding previous weekend, very busy, carried lot of trays of food, wore heels."  Any movement aggravates her pain, not moving eases her pain.  In the morning, too painful to get out of bed, spends evenings in

14

recliner, sleeps in recliner at night. Functional activity scale 13/64, "severe osteoarthritis of both feet/ankles, uses a w/c [walking cane] to walk long distances. . . . Gait is slowed/antalgic [self-protective limp due to pain], severe limits in distances, extreme tenderness to palpation along central low back, both buttocks and hips." Range of motion was 15 (normal is 80).

Plaintiff went to her physical therapy appointment in a wheelchair on December 5, 2001 (Tr. at 108). Her pain was an 8, down from a 9. By December 7, 2001, she reported her pain as a 7, better on the left side (Tr. at 108). "Tender to light palpation over right glut/piriformis". By December 10, 2001, her pain was still a 7, her functional activity scale was 17% and the therapist noted that plaintiff was progressing slowly (Tr. at 108). On December 14, 2001, plaintiff's pain was an 8, she reported the exercises had not helped (Tr. at 107). The therapist observed slowed, antalgic gait. Functional activity scale was 17%, initially was 20% before therapy. Three of six goals of treatment were met, three were not met. Recommended one more visit and reassessment.

On December 12, 2001, plaintiff had four views of her lumbar spine taken by radiologist Joseph Chang, M.D., at KU (Tr. at 111). "There is mild left convexity lumbar scoliosis. . . . There is disk space narrowing at L3-4 with anterior osteophyte formation at this level. . . . [A] small calcific density in the right paraspinal area . . . . This is suggestive of a calcified lymph node." Impression: unchanged degenerative disk disease at L3-4.

Case 4:04-cv-00965-REL   Document 14   Filed 09/30/05   Page 15 of 37

On December 27, 2001, plaintiff had an MRI of the lumbar spine performed by Philip Johnson, M.D., at KU (Tr. at 109-110). Impression: 1. Mild degenerative disk disease with no significant neural foraminal stenosis. There is mild central canal narrowing to 10 mm at the L4-L5 level. 2. Hypertrophic degenerative facet disease at L4-L5 level.

On February 19, 2002, plaintiff saw Doug Burton, M.D., an orthopedic surgeon at KU, after having been referred by Dr. Daaleman for low back pain (Tr. at 165-166). "This started back in November of 2001. She really was just walking down the hallway when her back started to hurt. It has become pretty debilitating since then. The patient is getting around in a wheelchair. She does not get up and around in the house much. . . . She has been taking up to 5 Percocet per day and Neurontin 600 mg tid [three times a day]. She has had one lumbar epidural steroid injection which was not helpful for her. She tried physical therapy for a couple of weeks and did not feel that it helped."

Physical exam: ". . . On examination she stands in a forward flexed posture. She walks with some difficulty. She has pain to light palpation in the low lumbar spine. . . . Range of motion of the hips causes back pain and no groin pain."

Radiographic evaluation. "There is some mild sclerosis in the SI joints bilaterally. On the lateral view there is some spondylosis at the 3-4 segment. . . . There is an MRI available for review. It is dated December 27, 2001. On the T2

16

weighted sagittal images there is evidence of disk desiccation at 2-3 and 3-4. . . .

There is a little increased signal seen in the facet joints at 3-4 and 4-5 consistent

with some slight facet arthrosis."

Impression:  At this time is acute low back pain now in chronic range

without evidence of spinal instability.

Plan:  "What she needs is an exhaustive exercise therapy.  I discussed

this with her.  Her husband and she had several questions regarding whether or

not she can go back to work and issues of disability.  I discussed with them that I

think that whether she goes back to work is entirely up to her.  She has back pain

and how much that limits her is really up to her. . . .  I have given her a

prescription for physical therapy."

On February 28, 2002, plaintiff saw Timothy Daaleman, D.O., at KU for a

follow up on low back pain (Tr. at 201).  "She was seen by Dr. Burton and Dr.

Becker in Pain Management.  Per their report, Dr. Burton does not feel that she

is a surgical candidate. . . .  In addition she underwent a steroid injection by Dr.

Becker with no relief in her symptomatology. . . .  Patient currently is

intermittently confined to her chair."  He assessed low back pain secondary to

degenerative disc disease.  "Continue with her Neurontin at 600 mg tid [three

times per day] in addition to Vioxx at 50 mg PO [by mouth] qd [every day].  We

will change her bedtime does of Amitriptyline to 50 mg q. [every] h.s. [at

bedtime].  Also continue with her Percocet 5/325 mg one PO [by mouth] q [every] 6-8 h [hours] prn [as needed] for pain."

On March 27, 2002, plaintiff saw Dr. Milligan at KU with complaints of new feelings of nervousness (Tr. at 200).    She had been off her beta blocker for several days and was feeling anxious and having tremors.  "Older than stated age appearing WF with look of worry and anxiety."  Dr. Milligan observed mild tremors, shakes, nervousness.  He recommended she resume some illegible medication.

On April 9, 2002, Dr. Daaleman completed an Attending Physician's Statement for Disability Claim (Tr. at 174-175).  His diagnosis was chronic pain syndrome, degenerative disc disease, low back pain.  Subjective symptoms included low back pain.  Objective findings:  MRI showed L4-L5 [illegible] narrowing, [illegible] and degenerative disc disease.  Dr. Daaleman described plaintiff's physical impairment as marked limitation, 60-70%.  His opinion was that plaintiff was not able to return to her job or do any other job, she is not a suitable candidate for trial employment.

On April 16, 2002, plaintiff saw Dr. Milligan at KU (Tr. at 199).  Plaintiff complained of leg swelling for 3 days.  Plan:  Keep legs elevated and rest. Remainder of record is illegible.

On April 17, 2002, Timothy Link, M.D., a consulting physician who apparently did not examine plaintiff, completed a Residual Physical Functional

18

Capacity Assessment (Tr. at 176-183). Dr. Link found that plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds; she could stand or walk at least two hours in an eight-hour day; could sit for six hours in an eight-hour day; and had an unlimited ability to push or pull other than the limitations for lifting and carrying. Plaintiff can occasionally climb, balance, stoop, kneel, and crouch, but she can never crawl.

In support of those findings, Dr. Link stated, "[I]mprovement can be expected. . . . The alleged feet problems and hand problems are not currently active (no MER since 7/00 and 5/00 respectively) and claimant has a proven capacity for full-time work since then until 11/01, and an AOD [alleged onset date] due only to an acute LBP [lower back pain]. Thus, the claimant is expected to be capable of returning to prior work by 11/02."

On May 2, 2002, plaintiff saw Dr. Daaleman for a follow up of her chronic back pain (Tr. at 198). Dr. Daaleman assessed:

1.      Chronic low back pain. We will discontinue her Neurontin and Vioxx and continue with Amitriptyline 50 mg PO qhs [every night at bedtime]. We will also continue on her Oxycontin 40 mg on PO bid [by mouth twice a day].

2.      Peripheral edema. If the symptoms persist after discontinuing the medications, we will consider checking a chem profile in addition to liver function studies. She is to follow up with Dr. Milligan.

Plaintiff returned to see Dr. Milligan on August 16, 2002 (Tr. at 197). He noted that plaintiff had been treated for some time for chronic low back pain. She said Oxycontin helps the pain. He assessed chronic low back pain. Most of the record is illegible.

Plaintiff saw Dr. Milligan again on November 1, 2002 (Tr. at 195). He diagnosed degenerative disc disease and migraines. Most of the record is illegible.

On February 3, 2003, Dr. Milligan, completed an Attending Physician's Statement of Disability (Tr. at 187). His diagnosis was chronic low back pain. Objective findings included palpable spasm and tenderness in [illegible] and lumbar region. He found that plaintiff is totally disabled for her regular occupation and for any occupation, and she is indefinitely off work. "Ms. Reeds has severe low back pain apparently due to degenerative disc disease. She is partially controlled with pain medications and muscle relaxants."

On April 8, 2003, plaintiff returned to see Dr. Milligan who diagnosed chronic low back pain, migraine headaches, and hyperlipidemia (Tr. at 194). Most of the record is illegible.

On August 25, 2003, plaintiff returned to see Dr. Milligan who diagnosed chronic low back pain, migraine headaches, and hyperlipidemia (Tr. at 193). Most of the record is illegible.

20

On April 25, 2004, plaintiff saw a doctor at KU (the doctor's signature was cut off in xeroxing (Tr. at 191-192). Plaintiff reported, "she has been having increasing problems with her hands including numbness and tingling down into the thumb and first two fingers and occasionally dropping things. She says that the pain is now going up into her elbows and her upper arms. She was told by Dr. Toby in the past that she needed surgery for carpal tunnel syndrome, but had not had it done yet. She also has migraine headaches which are well controlled with her Inderal. She does use Maxalt once in a while for those." The doctor observed that plaintiff's strength is markedly decreased bilaterally. There is tenderness over the lateral epicondyles bilaterally with pain on forced supination. She does have some mild shoulder tenderness, but no restriction of motion there.

Assessment:

1.     Chronic low back pain.

2.     Bilateral carpal tunnel syndrome.

3.     Bilateral epicondylitis.

4.     Hormone replacement therapy.

5.     Migraines

6.     Hyperlipidemia.

(Tr. at 191-192).

***C.*** **SUMMARY OF TESTIMONY**

During the April 8, 2004, hearing, plaintiff testified; Dr. Chernoff testified as a medical expert, and Amy Salva testified as a vocational expert. Prior to taking testimony, the ALJ inquired about $5,379.87 listed as earnings in 2002 (Tr. at 211). Plaintiff's attorney explained that she received short-term disability payments from her private insurance company during 2002 (Tr. at 212).

**1.** **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 55 years of age (Tr. at 228). She went to school through 11th grade and then got a G.E.D. (Tr. at 228).

Plaintiff can no longer work because although she can sit, she cannot twist, turn, or lift, and because she has carpel tunnel syndrome in both wrists (Tr. at 230). Her hands are numb almost all the time, and she cannot lift much of anything anymore (Tr. at 230). Plaintiff has a constant sharp pain in her back (Tr. at 230). If she twists or turns, it hurts worse (Tr. at 230). Her medicine helps a lot, but she still has a dull ache most of the time (Tr. at 230). Plaintiff constantly has to change positions when she is sitting to lessen her pain (Tr. at 230). Sitting in a recliner relieves some of her back pain and helps her feet (Tr. at 230).

Although plaintiff's medicine helps, it causes her to be sleepy (Tr. at 231). That side effect has not lessened since she started taking the medication (Tr. at 231). Plaintiff cannot stand for very long because she has osteoarthritis in both feet (Tr. at 231). Even sitting causes her feet to ache, but standing makes them

22

hurt unbearably (Tr. at 231-232).  Plaintiff can stand for only five to ten minutes at a time (Tr. at 232).  About once a week, she experiences swelling in her feet and cannot tie her shoes (Tr. at 232).  Plaintiff spends most of her day in the recliner, trying to change positions without twisting her back (Tr. at 232).

Plaintiff cannot drive because her medicine makes her drowsy and she cannot twist to look out the side windows because of her back (Tr. at 233).

Plaintiff has carpal tunnel syndrome in both arms and her hands are numb most of the time (Tr. at 234).  Her hands and arms ache all the time as well (Tr. at 234).  Although plaintiff's doctor recommended she have surgery in 2000, she could not afford to take that much time off work because she earned the only family income at the time (Tr. at 234).  Now that she is not working, she has the time but has no insurance so she cannot pay for the surgery (Tr. at 234-235). Plaintiff can no longer type, cook, or put puzzles together (Tr. at 235).  She has trouble dressing herself, her daughter ties her shoes for her (Tr. at 235).  Plaintiff can use a pen to sign her name but cannot do much other writing (Tr. at 235).

Plaintiff lives with her daughter and her 14-year-old grandson (Tr. at 240). Plaintiff does no housework, she goes to the grocery store with her daughter and uses a wheelchair at the store, and she does very little cooking (Tr. at 240).

### 2.    Medical Expert testimony.

Selbert G. Chernoff, M.D., testified at the request of the Administrative Law Judge.  Dr. Chernoff is board certified in internal medicine (Tr. at 214).  Dr. Chernoff testified that with plaintiff's body mass index of 40, she is morbidly obese (Tr. at 214-215).  In reviewing the records, Dr. Chernoff stated that it was hard for him to understand what the radiologist was saying in the report of plaintiff's December 2001 MRI (Tr. at 215).  After stating that he did not understand the radiologist's report, he interpreted it as follows:  "But the best you can say is that if there is spinal stenosis, it's, it's barely diagnosable." (Tr. at 215).

Dr. Chernoff found that plaintiff's complaints of back pain were credible because she does have a source of some backache, being the narrowing of the disc space at L3-4 with some anterior osteophytes at that level and some mild degenerative joint disease of her back (Tr. at 215-216).  He found that plaintiff has bilateral carpal tunnel syndrome, possibly plantar fasciitis, and migraines improved by the use of daily Propranolol (Tr. at 216).

He continued as follows:  "[H]er main problem is a chronic pain syndrome from the prior back, hands and feet.  And together with that, there appears to be I believe at times, a, a clinical picture suggestive of symptom magnification.  The Dr. Daaleman, examiner, he's a pain physician at KU Med Center.  . . . .  And she had pain to light palpation in the low lumbar spine.   Now, that's a medical code for somebody that's – for reacting inappropriately.  There are illnesses that

24

produce tenderness to light palpation.  So this is evidence of exaggeration.  He said his impression was at this time, low back pain in chronic range, without evidence of spinal instability.  He had noted the quote, 'slight facet arthrosis.'  So again he thought that the DJD of her back was rather minimal." (Tr. at 217).  In fact, Dr. Daaleman found plaintiff totally disabled.

Dr. Chernoff testified that determination of a residual functional capacity "is very difficult here.  And I think it will depend on looking closely at her ADL's [activities of daily living] and, and, other activities.  And maybe even with third party statements.  Because it is indeed possible for severe pain to limit people.  But with the, the one statement, and there's only the one in the record."  Dr. Chernoff did not have any of Dr. Milligan's records (Tr. at 226).  Dr. Milligan also found plaintiff totally disabled.

Dr. Chernoff agreed that plaintiff's carpal tunnel syndrome would impose some limitations such as no repetitive motion, no repetitive fingering, no repetitive handling, and no vibration (Tr. at 226, 227).

Dr. Chernoff agreed that Oxycontin, which plaintiff takes for her back pain, is "rather strong pain medication."  (Tr. at 219).  He was not aware of how long plaintiff had been taking that medication.  He went through the records with plaintiff's attorney who pointed out the constant refills of Oxycontin, and pointed out the constant refills of Oramorph, which is a long-acting form of morphine (Tr. at 223).  When the ALJ asked what the effect of all that medication would be on

Case 4:04-cv-00965-REL   Document 14   Filed 09/30/05   Page 25 of 37

one's ability to work, Dr. Chernoff testified that at first, it would "certainly be sedating" but that the person would eventually get used to it and have no side effects at all (Tr. at 224).

Regarding plaintiff's durational denial of benefits, Dr. Chernoff testified that, "durational is, is [not] the issue at all. Because it's clear that her symptoms had continued on for more than, more than a year anyhow." (Tr. at 220).

Dr. Chernoff agreed that plaintiff's morbid obesity would aggravate her back disorder and increase her back pain (Tr. at 225). If she became active, her morbid obesity would also aggravate her plantar fasciitis (Tr. at 225).

**3. Vocational expert testimony.**

Vocational expert Amy Salva testified at the request of the Administrative Law Judge. The vocational expert testified that plaintiff's past relevant work includes switchboard operator, which is sedentary and semi-skilled; telemarketer, which is sedentary and unskilled; and hotel front desk clerk, which is light and semi-skilled (Tr. at 242).

The first hypothetical was as follows: Assume a person with a back disorder with some evidence of degenerative joint disease in the back and complaints of back pain, disc space changes, carpal tunnel syndrome bilaterally, pain in the hands, a foot problems, diagnosis of plantar fasciitis, migraine headaches helped with the use of medication, and obesity (Tr. at 242). This person would be restricted to lifting and carrying ten to 15 pounds maximum and

26

frequently could lift three to five pounds (Tr. at 243).

The vocational expert testified that such a person could return to plaintiff's job as switchboard operator, telemarketer, and possibly hotel front desk clerk (Tr. at 243). This would be so even if plaintiff's impairments mildly restricted her concentration, persistence and pace (Tr. at 243). If plaintiff's concentration, persistence, and pace were moderately impaired, she would have difficulty performing any job (Tr. at 243).

If plaintiff were to miss two to three days of work per month due to her obesity and pain, she would be unable to maintain full time employment (Tr. at 244). If plaintiff were significantly limited in the use of her hands due to carpal tunnel syndrome, she would not be able to be a switchboard operator (Tr. at 244). She could perform the job of telemarketer by operating a keyboard with one or two fingers (Tr. at 244-245).

Plaintiff's attorney asked the following hypothetical: A person who is limited to sedentary work and who must frequently elevate her feet to chair height throughout the day (Tr. at 247). The vocational expert testified that such a person could not work (Tr. at 247). If the person were limited to sedentary work and could use her hands for no more than very infrequent data entry type functions or writing functions, the person would not be able to do any of plaintiff's past relevant work (Tr. at 247).

27

## V.    FINDINGS OF THE ALJ

On April 20, 2004, Administrative Law Judge Jack Reed entered his order finding plaintiff not disabled.  He found that plaintiff's past relevant work consisted of working as a switchboard operator, a telemarketer, and hotel front desk clerk (Tr. at 14).  Plaintiff had not engaged in substantial gainful activity since her alleged onset date of November 27, 2001 (Tr. at 14).  Plaintiff suffers from the severe impairments of mild degenerative disc disease of the lumbar spine at the L4-5 disc level with no significant neural foraminal stenosis; mild central canal narrowing at the L4-5 level; bilateral carpal tunnel syndrome; bilateral epicondylitis; bilateral plantar fasciitis; history of migraines; morbid obesity; and history of Hepatitis C infection (Tr. at 14).  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

After finding plaintiff not credible and discounting the opinions of her treating physicians, the ALJ found that plaintiff retains the residual functional capacity to perform sedentary work (Tr. at 19).  As her past relevant work as a switchboard operator and a telemarketer are performed at the sedentary level, the ALJ found that plaintiff could return to her past relevant work (Tr. at 19). Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

Case 4:04-cv-00965-REL   Document 14   Filed 09/30/05   Page 28 of 37

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is not supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by

29

third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

Although claimant has had a fairly good work history up until her alleged onset date, it is nonetheless noted that the short-term disability monthly payments she receives in the amount of $1,208.00 from her former employment might be reducing her incentive to work somewhat.

In terms of daily activities, claimant testified that she was able to care for her personal needs except that she required assistance to tie her shoes. She noted that she was able to write, but that her daughter-in-law wrote out the monthly bills for her. Overall, claimant testified that she lived with her daughter and her 14 year old grandson, and that the only household chores she performed were some light cooking, light cleaning, and some dishwashing. Additionally, claimant stated that she went grocery shopping with her daughter, but required a wheelchair at the store to get around. Overall, claimant noted that the only times she went out were to pay bills, and to go grocery shopping. Herein, she testified that she mainly stayed at home and sat in her recliner, watching television. . . . Overall, the undersigned finds that claimant's activities of daily living do not support a finding that her symptoms were preclude all types of competitive employment. . . .

(Tr. at 15-16).

Case 4:04-cv-00965-REL   Document 14   Filed 09/30/05   Page 30 of 37

## 1. PRIOR WORK RECORD

The ALJ found that plaintiff had a good work record up until her disability. He then dismissed this factor because plaintiff had received approximately $1,200 per month in short-term disability insurance payments.

Plaintiff was earning in excess of $20,000 per year when she had to quit work due to her disability. The ALJ's assumption that plaintiff's $1,200 per month in short-term disability was her incentive to quit working rather than quitting because of her disability makes little sense when you compare the $5,379.87 she received in 2002 for short-term disability with the more than $21,000.00 she earned by working during 2001. One can hardly say that taking a 75% cut in pay is a person's motivation for not returning to work.

I find that this factor supports the plaintiff's credibility.

## 2. DAILY ACTIVITIES

The ALJ found that plaintiff's "activities of daily living do not support a finding that her symptoms would preclude all types of competitive employment." (Tr. at 16). This statement immediately followed his recitation of plaintiff's alleged daily activities: needing assistance to tie her shoes; needing assistance in writing out monthly bills; performing only light cooking, light cleaning, and some dishwashing; going to the grocery store with her daughter and in a wheelchair; not going out at all other than to go to the grocery store or pay bills; and staying at home sitting in a recliner watching television all day (Tr. at 15).

The ALJ acknowledged that a claimant need not be bedridden to be found disabled. <u>Reed v. Barnhart</u>, 399 F.3d 917, 923 (8th Cir. 2005). Although he apparently found that plaintiff is not bedridden, I can't imagine a lifestyle more "recliner-ridden" than plaintiff's. There is no evidence that plaintiff's daily activities are consistent with the ability to engage in full time employment. This factor supports her credibility.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff testified that her hands are numb most of the time, her hands and arms ache all the time, and she has a constant sharp pain in her back. The ALJ did not discuss this factor.

I find that the medical records support plaintiff's allegations. She was diagnosed with chronic low back pain, left convexity lumbar scoliosis, disc space narrowing with anterior osteophyte formation, degenerative disc disease, central canal narrowing, hypertrophic degenerative facet disease, peripheral edema, migraines, dizziness, bilateral carpal tunnel syndrome, tennis elbow, bilateral epicondylitis, bilateral plantar fasciitis, diffuse foot pain, and uptake in both subtalar joints. Plaintiff complained to her doctors of pain and numbness in her hands and arms on multiple occasions (Tr. at 170, 171, 191-192); she complained of foot problems on at least five occasions (Tr. at 113, 167, 168-169, 170, 199); she complained of headaches and dizziness on at least nine occasions (Tr. at 123, 124-125, 127-130, 148, 149-152, 153-154, 157-158, 191-

32

192, 193, 194); and she complained of back problems on at least 17 different occasions (Tr. at 107, 108, 109-110, 111, 113, 115, 116-120, 165-166, 187, 191-192, 193, 194, 197, and 198).

I find that the medical records support plaintiff's allegations of constant, intense pain in her hands, arms, feet, and back. This factor supports plaintiff's credibility.

### 4.    *PRECIPITATING AND AGGRAVATING FACTORS*

Plaintiff repeatedly told her doctors (and stated as much in her administrative paperwork in connection with this disability case) that movement increases her pain, and remaining still helps her pain. She cannot twist, and therefore cannot drive, because of her back pain. She has trouble walking because of her obesity and her foot pain. She cannot write or otherwise use her hands due to her carpal tunnel syndrome and epicondylitis. All observations by third parties in the record support these alleged limitations: no one has ever observed plaintiff moving in a manner other than that described above.

The ALJ did not discuss this factor. I find that this factor supports plaintiff's credibility.

### 5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

The ALJ relied heavily on the fact that plaintiff claimed some of her medication helped a lot. Although her medication does help, the record establishes that plaintiff continued to experience side effects, continued to

experience pain, and her doctors regularly adjusted her medications and/or dosages in an attempt to obtain more relief from pain. Plaintiff's migraine medication helped, but she continued to experience dizziness and a feeling that she was going to lose consciousness. Although plaintiff's pain medication for her back helped her, she continues to experience constant pain in her back.

The mere fact that plaintiff's medication helps her some is not grounds for denying a disability claim. The record establishes that although plaintiff's medication helps, it does not alleviate her pain and does not allow her to function at the level she would need to in order to perform full-time work. This factor supports plaintiff's credibility.

### 6.    FUNCTIONAL RESTRICTIONS

The ALJ failed to discuss this factor. The record establishes that plaintiff was told to rest with her feet elevated due to her foot problems. She was unable to drive due to her inability to twist. She used a wheelchair to go to the doctor and the grocery store, and she used a walking cane as well. Plaintiff was found, for various reasons, not to be a surgical candidate for her back or for her feet. She had too many things wrong with her feet for surgery on any one part to provide any amount of relief. Plaintiff participated in physical therapy as directed for her back and got very little if any relief from her pain.

Plaintiff's functional restrictions support her subjective allegations of disabling pain.

**B.     CREDIBILITY CONCLUSION**

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff's allegations are not credible.

**VII.     RESIDUAL FUNCTIONAL CAPACITY**

Plaintiff argues that the ALJ's residual functional capacity assessment is not supported by substantial evidence.  The ALJ found that plaintiff retains the residual functional capacity to perform sedentary work.

According to the Dictionary of Occupational Titles, sedentary work requires the ability to lift no more than ten pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.

Case 4:04-cv-00965-REL   Document 14   Filed 09/30/05   Page 35 of 37

Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.  Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.  See SSA Policy Site: POMS Section DI 25015.020.

Here, the ALJ found that plaintiff had the residual functional capacity to perform sedentary work.  However, the medical records clearly establish that plaintiff does not have the ability to use both of her hands.  In fact, she is unable to use her hands for more than to write her name occasionally.  In addition, the record establishes that plaintiff is unable to sit upright in a chair for at least six hours per day.  She is unable to stand or walk up to two hours per day. Therefore, the ALJ's residual functional capacity assessment is not based on substantial evidence in the record.

## VIII.   ABILITY TO RETURN TO WORK

The ALJ found, by using the improper RFC and the testimony of the vocational expert, that plaintiff could return to her past relevant work.  The record, however, establishes that plaintiff could use her hands for no more than very infrequent data entry type functions or writing functions (and the vocational

Case 4:04-cv-00965-REL   Document 14   Filed 09/30/05   Page 36 of 37

expert testified that such a person could not do any of plaintiff's past relevant work), and that plaintiff needs to sit with her feet elevated most of the day due to back pain and foot problems (and the vocational expert testified that such a person could perform no substantial gainful activity).

Based on the substantial evidence in the record, I find that the ALJ erred in finding that plaintiff could return to her past relevant work. I further find that the ALJ erred in finding plaintiff not disabled. Based on these findings, it is unnecessary to address the remaining issues raised by plaintiff in her brief.

## IX. CONCLUSIONS

Because I find that the ALJ erred in finding plaintiff not disabled, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 29, 2005

37